UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN CREECH,

                Petitioner,

v.

UNITED STATES OF AMERICA,

                Respondent.
_____/

Civil Case Number 22-12487
Criminal Case Number 17-20544
Honorable David M. Lawson

## **OPINION AND ORDER DENYING MOTION TO VACATE SENTENCE**

Petitioner John Creech was convicted by a jury of conspiring to sell more than 100 grams of heroin. Most of the evidence against him came from the testimony of his erstwhile coconspirator, Craig Todd, who had a checkered past and cooperated with the government in exchange for leniency. Creech was sentenced to a bottom-of-guideline sentence of 130 months, and his conviction and sentence were affirmed on direct appeal. *United States v. Creech*, 852 F. App'x 172 (6th Cir.), *cert. den.*, 132 S. Ct. 374 (2021). Creech now has filed a motion to vacate his sentence and conviction, arguing that his attorneys did not provide representation consistent with the Constitution, mainly because they misled him into agreeing to a stipulation regarding the laboratory analysis of the seized drugs. He also complains that his attorneys failed to exploit inconsistencies in the lab report, forewent the opportunity to cross-examine the chemist, and failed to use the inconsistent laboratory information to cross-examine witness Todd. The motion is fully briefed, and no hearing is necessary to determine that the claims lack merit. The motion will be denied.

I.

Petitioner Creech had a history of dealing with Todd, who owed him money for drugs that Creech fronted on consignment. Creech maintained, however, that the debt was for marijuana,

and that he was not involved in the distribution of heroin, and certainly not more than 100 grams of it. The direct trial evidence against Creech, which came mostly from Todd, suggested otherwise. Summarizing the case against Creech on his direct appeal, the court of appeals wrote:

> John Creech received drugs on consignment. And he sold drugs on consignment. Those credit relationships show trust with his supplier and with his dealer . . . . Creech lived in California and sold drugs. But he did not limit his sales to California. Beginning in May 2012, he cultivated a relationship with Craig Todd — a drug dealer in Detroit — to sell cocaine and heroin outside the state. In furtherance of their business deal, Creech provided Todd three kilograms of heroin on credit. The quality was so poor[,] however, Todd did not think he could sell it. So, Creech called his supplier. After both men spoke to the supplier, Creech told Todd that he would return in a few days. And he did.
>
> Creech returned with a better batch of heroin a few days later. Despite the enhanced quality, Todd's sales came slowly. When Creech called to check in, Todd revealed that he had only sold 100 grams. Creech returned to Todd's house to collect the minimal proceeds. Creech called his supplier, who instructed him to take back two kilograms of the product because Todd was selling it too slowly.
>
> Around the same time, Creech's home life spiraled out of control. He learned his wife, Chandrika Cade, was having an affair with Gavin Smith. *People v. Creech*, 2019 WL 1122691, at *1-3 (Cal. Ct. App. Mar. 12, 2019). An enraged Creech confronted the couple in a parking lot and killed Smith. *Id.* at *3.
>
> Fearing lockup on a separate drug charge, Creech texted Todd to give the heroin proceeds to Cade. He also asked Cade to collect the money Todd owed him, which Cade knew was a drug debt.
>
> Todd faced legal problems of his own. Before he could finish selling Creech's heroin, Todd was ensnared by the Drug Enforcement Agency (DEA) and worked for the DEA after August 14, 2012. Todd explained that Creech fronted him heroin to sell.
>
> While Creech was being detained on separate drug charges, Cade was still trying to collect the drug money that Todd owed Creech. As part of the investigation, Todd went to California and gave Cade $5,000 for the "H." Todd next met with Creech in jail where he told Creech that he had given $5,000 to Cade. In response, Creech held up a napkin with "$95" written on it — the amount Todd still owed him in thousands. Creech explained that he still owed his supplier for the heroin, who was holding Creech's motorcycle until Creech was able to repay his debt. Creech said that the supplier had tried to reach Todd but was unable to. Creech gave Todd his supplier's number and told him to pay him directly.

> In late September 2013, the Government filed a criminal complaint against Creech. The complaint charged him with conspiring to possess with intent to distribute more than 100 grams of heroin. That complaint largely echoed the indictment filed four years later.
>
> The discovery of Smith's body brought yet more legal difficulties for Creech. California charged him with first-degree murder. At trial in July 2017 a jury convicted him of voluntary manslaughter.
>
> On August 17, 2017, a federal grand jury indicted Creech for conspiring with intent to distribute heroin. He moved to dismiss those charges as barred by the five-year statute of limitations. The district court denied that motion.
>
> Creech's drug trial finally came. When Cade was called to testify, Creech sought to exclude her testimony as confidential marital communications. The district court rejected that motion and determined the privilege did not apply.
>
> At trial, Creech also complained of a *Brady* violation. DEA Agent Bryan Sartori testified that he had unsuccessfully attempted to forensically extract the contents of Creech's phone. But Creech never received a forensic report of the failure. The Government, however, told the district court that it did not have possession of a report and did not believe it existed. The district court found no *Brady* violation.
>
> At the close of evidence, Creech moved for judgment of acquittal based on the statute of limitations. Again, the district court rejected the argument, relying on Creech's continued pursuit of payment. After his conviction, Creech moved for a new trial for the same statute of limitations reason. The district court denied the motion.

*Creech*, 852 F. App'x at 173-75. The Sixth Circuit rejected Creech's arguments that the charges in the indictment were time barred, that the Court erroneously determined that there was evidence that a drug conspiracy continued even after a co-conspirator turned government informant, that the delay in indictment violated his rights to due process and a speedy trial, that the proceedings were tainted by the government's alleged withholding of a cell phone forensic examination report, and that the Court erred by allowing testimony by Creech's ex-wife into evidence. *Id.* at 175-77.

Creech filed a timely motion to vacate his sentence under 28 U.S.C. § 2255. He contends that his trial counsel were constitutionally ineffective in four ways, but each of Creech's arguments center on a stipulation to which his attorneys agreed about the contents of a laboratory report

authored by the laboratory technician who analyzed the drugs seized from Todd. The Court incorporated the stipulation into the jury instructions as follows:

> The parties reached some stipulations that have eliminated the need to call a witness to testify to certain facts. First, Trial Exhibit Number 2, a Ziploc bag containing three smaller Ziploc bags which in turn was found in a blue bag at Craig Todd's house in Southfield, Michigan, on August 15, 2012, contained suspected heroin, was tested at a Drug Enforcement Administration laboratory on November 16, 2012, and was found to contain 100 grams or more of a detectable amount of heroin; that is, 260.3 grams of 28.9 percent pure heroin and 27.7 grams of 16.5 percent pure heroin, respectively, a Schedule I controlled substance.

Trial Tr., ECF No. 109, PageID.1812. First, Creech contends that some of the details of this stipulation, which he had received, reviewed, and discussed with counsel, differed from what Creech and trial counsel had discussed before trial. Second, he maintains that the conversations between government and defense counsel discussing the stipulation and its underlying details were not documented but should have been. Third, Creech criticized defense counsel for not "request[ing] an evidentiary hearing or file any motions" to litigate the details of the laboratory analysis underlying the drug stipulation, which would have revealed inconsistencies undermining Todd's credibility. Fourth, Creech complains that trial counsel did not "ask any witness or expert, a single question" at trial about the drug stipulation or lab analysis for the seized heroin. ECF 124, PageID.2153, 2155.

## II.

It is well understood that a federal defendant challenging his sentence under section 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court lacked jurisdiction, the sentence exceeds the maximum penalty allowed by law, or it "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). And he "must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire

proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

Here, Creech's sole contention is that his trial attorneys' performances dipped below professional norms. To succeed on an ineffective assistance of counsel claim, the petitioner "must show both deficient performance by counsel and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). One way of establishing deficient performance is to show that defense counsel missed a meritorious argument under the controlling law. However, the failure to file a meritless motion or raise a groundless objection does not constitute deficient performance. *Jalowiec v. Bradshaw*, 657 F.3d 293, 321-22 (stating that an "attorney is not required to raise a non-meritorious claim" (citing *Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007))); *see also Knowles*, 556 U.S. at 123 (noting that the "[Supreme] Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success" to avoid a finding of deficient performance under *Strickland*).

Prevailing professional norms require that an attorney either must investigate a known potential witness or make a reasonable decision that investigating a witness is not necessary. *Hawkins v. Coyle*, 547 F.3d 540, 548 (6th Cir. 2008). "The failure to call favorable witnesses can amount to ineffective assistance where it results in prejudice to the defense," *Pillette v. Berghuis*, 408 F. App'x 873, 884 (6th Cir. 2010), but the Court "must presume that decisions of what evidence to present and whether to call or question witnesses are matters of trial strategy," *Cathron v. Jones*, 77 F. App'x 835, 841 (6th Cir. 2003) (citing *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002)). However, "[w]here counsel fails to investigate and interview promising witnesses,

and therefore 'has no reason to believe they would not be valuable in securing [defendant's] release,' counsel's inaction constitutes negligence, not trial strategy." *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992) (quoting *United States ex rel. Cosey v. Wolff*, 727 F.2d 656, 658 n.3 (7th Cir. 1984)).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A.

In a federal habeas proceeding, when the Court weighs a claim of ineffective assistance, "[a]n evidentiary hearing is required unless the record conclusively shows that the petitioner is entitled to no relief" on his claim. *Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018). "Where there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Ibid.* However, "[a] petitioner's mere assertion of his innocence, without more, does not entitle him to an evidentiary hearing." *Ibid.* The record here dispels all relevant factual disputes and shows that Creech is not entitled to relief.

B.

Creech's four arguments are interrelated and are based on the premise that flaws and inconsistencies in the evidence about the drugs that were seized and the drugs described by Todd, contrasted with the drugs that were analyzed, would have undermined the government's theory that he conspired with Todd to sell over 100 grams of heroin. For instance, he contends that trial counsel "misadvised him" about the content of the stipulation concerning the amount and type of

narcotics seized from the co-conspirator's residence, because documents produced in discovery indicated that three bags of heroin were seized with a total net weight of 288 grams, but the stipulation did not incorporate any specifics of the amount and type of materials seized. He says that trial counsel never showed him the stipulation before it was admitted at trial, and falsely represented to him that, "Bag #2, one of the three bags of heroin, would specifically be addressed in the stipulation," but this was not the case. He also contends that trial counsel failed to investigate discrepancies in lab reports disclosed by the government during discovery, including the petitioner's observations that there were only two lab control numbers listed in the reports, but three bags of heroin were reported to have been seized, and other documents indicated variously that either six or nine bags of narcotics were seized, but only four lab control numbers total were associated with testing of suspected contraband substances. And he insists that trial counsel acted ineptly by attempting to further investigate discrepancies in the lab reports when they submitted a supplemental discovery request demanding "all DEA Forms 7 and 113 and any latent fingerprint reports for *Laboratory No.* 267443," erroneously citing a "Laboratory Number" rather than "*Laboratory Control No.* 267443," which prompted the government to respond that there was no relevant discovery to disclose because the material in question (a/k/a "Bag #2") was "not a part of the government's case" against the petitioner.

To bolster these criticisms, Creech contends that a record of some sort should have been made of the discussions between his attorney and government counsel that led to the stipulation, and that defense counsel should have insisted on an evidentiary hearing to explore the inconsistencies between the laboratory analysis and other evidence about the seized drugs. He also says that defense counsel should have made inquiry at trial about the facts asserted in the stipulation.

These arguments represent a major shift in the strategy that actually was pursued at trial. There, the defense posited that Creech had nothing to do with the heroin that was seized from Todd, and that any money Todd owed him was referrable to some earlier marijuana transactions. Under that theory, the analysis of the drugs by the laboratory technician was relatively unimportant, and the stipulation about the technician's anticipated testimony was collateral to the defense. Creech contends that by entering into the stipulation instead of insisting on cross-examining the government's laboratory technician, trial counsel missed out on the opportunity to challenge the amount of drugs recovered from Todd's residence and to explore discrepancies in the lab reports suggesting that the government's technician had "manufactured evidence" by combining samples from two seized articles, one of which ("Bag #2") the government said was "not part of the case" against the petitioner. Certainly, attacking the evidence of the type and quantity of the drugs was one of the "strategic options" available to the defense. *See Dunn v. Reeves*, 594 U.S. 731, 739 (2021). But it was not the chosen strategy at trial. And urging now that a different strategy was a better path requires Creech to rebut "a 'strong presumption' of reasonableness" that favors defense counsel. *Ibid.* (citing *Harrington v. Richter*, 562 U.S. 86, 104 (2011)).

Creech fails in that attempt. Perhaps the best illustration of the defense strategy, which defense counsel reasonably chose with knowledge of the formidable evidence that the government presented, is summarized in defense counsel's closing argument to the jury. There, he laid out a point-by-point summary of the inconsistencies in Todd's testimony, and the ways in which his testimony did not line up with testimony from other witnesses, all of which counsel argued added up to a reasonable doubt about whether Creech was in fact the source of the heroin that Todd said

he accepted on consignment, thereby incurring the acknowledged debt to Creech. It is appropriate, therefore, to burden this opinion with the extended excerpts of that argument:

> And the first reason to doubt that I want to talk about is just a practical reason to doubt; like, the story that Craig Todd told you on the stand does not make sense. Agent Sartori told you that back in 2012 heroin was going for about $70,000 to $90,000; right? Common sense tells you that 70,000 will be low quality, 90,000, 95,000 or 90,000 would be high quality.
>
> Craig Todd testified that he bought a kilo of heroin. Okay? Now, let's remember what his testimony is. He testified he bought a kilo of heroin. He testified that he gave John Creech $5,000 during the weeks that Creech was going back and forth from Chicago to Detroit. Then he testified that in November he gave another $5,000 to Chandrika Cade or Creech, meaning that he knocked off $10,000 of his debt. So when asked by Mr. Gilmer-Hill, "Do you think that you owe him $95,000?" He said, "No. I had just given him 5,000 to Chandrika Creech. Now I owe him 90,000." So that would mean that he purchased low-quality heroin, because everybody is in agreement that this heroin was low, for $100,000. No agent has told you that heroin in 2012 was going for a $100,000, especially not low heroin. The reason why that doesn't make sense is because it wasn't. That was not the going price for heroin in 2012. And that is a reason to doubt Craig Todd's story.
>
> Another reason, practical reason to doubt, is that the return amount is off. You know, drug dealers, I mean, this is not, you know, a surprise, they are in that market to make money. They are trying to make a profit. So if you're buying something off of consignment, you're buying for a certain amount, you want to make enough where you can pay yourself and you can pay the wholesaler, the guy who you purchased it from.
>
> What did Craig Todd tell you that he was selling this heroin for? He told you he was selling it for 100 grams — $5,000 for 100 grams. I'm not a mathematician, but 100 grams for $5,000 off a kilogram is going to net you $50,000. So he wants you to believe that he purchased — he agreed to purchase heroin for $100,000, but he was only going to profit about $50,000, and he was going to somehow pay off some sort of debt.
>
> It doesn't make sense, ladies and gentlemen, because it's not true. He literally has made this story up. He is pointing the finger at John Creech for various reasons that we're going to get into.
>
> \* \* \*
>
> Now, again, we're not disputing that there is a debt. We're not disputing that it's over drugs. That's not in dispute. The dispute is whether this is over heroin. And so when he sits down and starts talking to John Creech, it's clear from the audio, it's clear to everybody in this courtroom that he believes Craig Todd owes him

some money. He believes he, Craig Todd, owes him $95,000. Now, it's not clear what it's for. It's not clear when this debt incurred, but it's clear that he owes him money, because he wrote down, "95." And you heard Craig Todd [sic] say, "Hey, that was the money that was owed to me." But when looking at that audio, and you will have the transcripts back there, again, this doesn't make sense; right?

If he owes Craig Todd — if Craig Todd owes John Creech $95,000, you know it's not for heroin, because nobody has said the going price for heroin back then is $100,000.

\* \* \*

Craig Todd tells you that when John Creech attempted to drop off the heroin and it was bad, John Creech got on the telephone and called a man with a Hispanic accent and they talked on the phone and the guy instructed him to bring this — bring the heroin back. Again, no phone call to corroborate that. Nobody from Chicago with a Hispanic accent ever took the stand to say anything like that happened. Every single thing, every fact, every incriminating point is flowing from a cooperating witness who needs the Government's help. That's how you frame this case.

\* \* \*

We're here because Craig Todd got caught with 13 kilograms of cocaine, over $500,000 worth of drugs in his car and was looking at the potential of life in prison. That's why we're here. Not because the Government knew about John Creech, but because they knew about Craig Todd. And so the Government is essentially hanging their hat on a three-time convicted felon who has everything to gain if you all believe his testimony.

\* \* \*

[T]hen there is John Creech. John Creech is not from Detroit, obviously. He is from California. John Creech, Craig Todd knew, was in jail at the time. John Creech, he owed John Creech money. Yes, this was an easy target, because he knew John Creech had been in the area a few months ago and he was somebody that he could easily put this on.

But you, ladies and gentlemen, you know that what he testified to was not true, because the story evolved and evolved and evolved. You heard Agent Sartori tell what you Craig Todd initially said about this heroin transaction. He said it was 500 grams. He said it was for — and he owed him an amount of $35,000. That is what the testimony was. That is what the version was that he told the agents when he was caught two days later. Agent Sartori said, "I had never heard $95,000 until 2019." And, in fact, when I talked to him about it, he couldn't give me a good answer about it. Because at that point, he really didn't know.

You see, the story kept changing because Craig Todd had to keep making it fit. When he went to LA County Jail and sat down with John Creech and John Creech

-10-

wrote that 95, he was in trouble, because he had now told — he had to own up to this. So now he had to figure out what was he going to do to be able to get the benefit from the Government and make this sound believable.

So all of a sudden he goes from 500 grams, then, on March 7, 2019, after Mr. Creech gets indicted and charged, after they know that this is going to trial, after they know that they are going to have to call this man to take the stand, now we have got to the fix this. Now I have got to sit down with the Government and come up with a story that makes this make sense. So it goes from 500 grams to 3 kilograms, over 3 kilograms of heroin. And it goes from $35,000 to almost $100,000.

And now we have testers and we're taking these McDonald's spoons and we're scooping it out, and John Creech is going to the gym, and I'm going to Detroit and I'm finding all these people to test this heroin, and I'm coming back and I tell him it's not good.

And then John Creech is packing everything up and driving back to Detroit [sic] and talking to the source and magically getting three more kilograms and coming back and repeating the process again. That makes no sense. None. But it fits. It was convenient. It made the numbers make sense. Now the $95,000 makes a little sense, even though it's still high. But, but, you know, there is some wiggle room with that.

But the story changed again in an odd way. Because the first time he told that story, he didn't say anything about cutting out 600 kilograms of heroin and fronting to this local dealer. That didn't come about until later. I mean, the first time that you all heard it, obviously, it was last week. And I asked him, I said, "Well, that's not what you told the agents on March 7." He said, again, the same thing that he said about Sartori. "Well, you got to ask the agents. You got to ask the agents. You got to ask the agents."

Well, the reason why he had to change it again is because the amount that they found didn't really add up to what he said on March 7th. March 7th, as you just heard Agent Richardson [sic] testify to, he said off of this kilogram he had sold about 400 grams, I think, maybe 400, 500 grams, whatever. What was left was about 296 grams, around 300. Now that doesn't make sense. So now when he goes back and he talks to the Government right before trial he says, "You know what, my bad, I gave 600 grams, actually, to some random drug dealer that I never got paid for. Then I also sold 200 grams for $5,000 each, and the rest of it is cut," and boom, now we got 300 grams.

Ladies and gentlemen, that is who the Government wants you to find beyond all reasonable doubt that this man entered into a conspiracy with to sell heroin, a man who cannot keep his story straight, a man who was looking at the possibility of life in prison, a man who has a habit of cooperating with the Government to get out of trouble. That, ladies and gentlemen, is woefully short of reasonable doubt.

> Ladies and gentlemen, you may not like John Creech. You may think he is a drug dealer, and that the $95,000 was a drug debt. But the Government has charged him with a specific crime. They charged him with a conspiracy to possess with intent to distribute heroin from May 2012 to November 2012. And the only person that says anything about a heroin deal, the only person who talks about this agreement about heroin is Craig Todd.
>
> None of the agents talked about it, Chandrika Cade didn't talk about it, and no other witness talked about it. So in order for you to find him guilty, you, just like the Government is doing, hook, line, and sinker with Craig Todd, and I don't think you can.

Trial Tr., ECF No. 109, PageID.1857-59, 1864, 1868, 1869, 1872-76.

Creech's criticism of this chosen trial strategy entirely overlooks the vast weight of the evidence that trial counsel was forced to confront and attempt to challenge, which was anchored by Craig Todd's testimony and prior statements made by Todd to law enforcement agents that Creech delivered to him on consignment at least two quantities of heroin each consisting of between 500 and 3,000 grams or more, depending on which version of Todd's narrative is believed. Creech's arguments simply ignore the evidence of transactions involving those vast quantities, focusing instead on marginal scrutiny of the precise composition of an approximately 300-gram remainder recovered from Todd's house at the time of his arrest. But according to Todd's testimony, the seized contraband was a pittance of the large initial consignment of between 500 and 3,000 grams, and even if all evidence concerning the recovered 300 grams were excluded, that would have left unchallenged Todd's damaging testimony concerning 200 to 2,700 grams of heroin which Todd said changed hands during the conspiracy.

In his motion, Creech asserts that he continued to harp on the lab report inconsistencies throughout the trial, and he says that lead trial counsel Michael Carter responded that delving into that topic "will only confuse the jurors," and "we need to keep it simple. We need to keep them focused on all of Todd's inconsistent statements." Pet., ECF No. 124, PageID.2154. But Creech insists that his counsel should have retained an independent expert to pursue further testing of "Bag

#2" from the seized consignment and should have delved into inconsistencies in the forensic evidence at trial by cross-examining Todd and the government's laboratory technician. However, Creech concedes that the decision not to delve further into the forensic chemical analysis and not to pursue examination and argumentation concerning the precise composition of the recovered drugs was a strategic choice made by his counsel at trial, in an effort to more cogently and persuasively frame the attack on Todd's credibility in a manner that would be more tractable and, in counsel's judgment, more likely to be accepted by the jury. That strategic choice was reasonable under the circumstances, considering the totality of Todd's testimony that counsel had to confront and attempt to discredit.

"[S]trategic decisions — including whether to hire an expert — are entitled to a 'strong presumption' of reasonableness." *Dunn*, 594 U.S. at 739 (citing *Harrington*, 562 U.S. at 104). "[W]hile defense counsel has a 'duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary,' those investigations are themselves retrospectively reviewed with a 'heavy measure of deference to counsel's judgments.'" *Miles v. Floyd*, No. 24-1096, 2025 WL 902800, at *4 (6th Cir. Mar. 25, 2025) (quoting *Strickland*, 466 U.S. at 691). "Defense lawyers have limited time and resources, and so must choose from among countless strategic options." *Dunn*, 594 U.S. at 739 (cleaned up). "Such decisions are particularly difficult because certain tactics carry the risk of harming the defense by undermining credibility with the jury or distracting from more important issues." *Ibid.* "The burden of rebutting this presumption 'rests squarely on the defendant,' and '[i]t should go without saying that the absence of evidence cannot overcome [it].'" *Ibid.* (quoting *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013)). "In fact, even if there is reason to think that counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that no

competent lawyer would have chosen." *Ibid.* (quoting *Titlow*, 571 U.S. at 23-24). Decisions as to what evidence to present and whether to call certain witnesses are presumed to be matters of trial strategy. Those strategic decisions must be reasonable, *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000), but the failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense, *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

The record here conclusively rebuts Creech's claim that his defense lawyer made an unreasonable choice of defense strategy, because he has not presented any evidence suggesting that counsel chose a path at trial that no competent lawyer would have chosen, and Creech was not deprived of a substantial defense where his lawyer ably impeached Todd's narrative with numerous inconsistencies and contradictions between Todd's own various pretrial statements and between Todd's testimony and that of other witnesses — none of which depended on the laboratory report or the stipulation.

Having elected to focus on challenging Todd's credibility through highlighting numerous other inconsistent and dubious aspects of his story, defense counsel's decision not to get bogged down in prolonged exploration of the precise chemical composition of a fraction of the total drug quantity allegedly involved in the conspiracy was reasonable under the circumstances. Having reasonably elected a trial strategy that did not require delving extensively into forensic analysis of the seized remainder of heroin taken from Todd, counsel also reasonably decided that defense resources would not be well spent engaging an expert or attempting to litigate the government's technical presentation further at trial, and counsel instead reasonably opted to minimize the impact of the technical analysis by agreeing to a stipulation about the quantity of drugs seized. Where counsel reasonably elects from several alternative defense strategies one that does not depend on

extraneous expert evidence, the decision to forego retaining an expert to develop such evidence is not deficient performance. *Miles*, 2025 WL 902800, at *4.

Creech has, at most, merely highlighted a supposed absence of evidence in the government's laboratory records — the absence of a laboratory report concerning the composition of "Bag #2" in the recovered drug sample — which he says calls into question the veracity of Todd's testimony that he was given "low quality" heroin by Creech, and which he also says suggests that the government's laboratory technician "manufactured evidence" by combining quantities of drugs seized, some of which he says the government conceded were "not part of the case." But those details, even if brought out at trial, would have added little additional weight to the already substantial quantity of more significant impeaching inconsistencies that defense counsel was able to highlight as grounds to doubt Todd's credibility, and Creech's counsel ably exploited those other opportunities to poke holes in Todd's narrative.

As the record shows, the bulk of the testimony arrayed against Creech bore on whether he had *any involvement at all* with one or more kilograms of heroin purportedly received on consignment by Todd. In light of that evidence, and Creech's position that he had no involvement in any heroin transaction, the chemical composition of a small remainder of the alleged contraband had little bearing on the defense likelihood of success. The decision not to dwell on such marginal proofs at trial was a reasonable one. Even affording full credit to Creech's claims about the evidence that he says should have been presented, it is not likely to have tipped the balance in the jury's evaluation of Todd's credibility. Where a witness has been adequately and thoroughly impeached by other means, the decision not to attempt additional impeachment of marginal relevance is not deficient performance. *Mitchell v. Vasbinder*, 644 F. Supp. 2d 846, 862 (E.D. Mich. 2009) ("[T]he Court finds that counsel's performance did not constitute ineffective

assistance of counsel, where the record demonstrates that counsel adequately cross-examined the complainant under the circumstances. There was no dispute that the robbery occurred. Rather, the dispute was whether Petitioner was, in fact, the robber. . . . The discrepancies in testimony regarding the hand in the pocket and what the surveillance cameras showed were relevant to whether Petitioner was armed and not to whether Petitioner was the robber. Therefore, even if counsel was deficient in failing to cross-examine or impeach the complainant regarding these issues, Petitioner failed to show that the proposed cross-examination would have affected the outcome of the proceeding, in light of the evidence against him."); *see also United States v. Johnson*, 621 F.2d 1073, 1076 (10th Cir. 1980) ("The purpose for desiring to recall Fowler was to present her with the allegations of Miller and to try further to impeach the original testimony. Even if this would be a proper method of impeaching Fowler, appellants' inability to do so under these circumstances did not deprive them of a fair trial. Fowler's testimony could be, and was, adequately impeached by other means."); *Carson v. United States*, No. 17-008, 2022 WL 845478, at *3 (N.D. Ohio Mar. 22, 2022) ("Mr. Carson vaguely claims that defense witnesses could discredit Johnson and Deeb. He offers no evidence to suggest that any proposed witness would have provided a novel or substantial defense."), *aff'd*, 88 F.4th 633 (6th Cir. 2023).

Defense counsel reasonably elected a trial strategy that did not depend on an exploration of technicalities relating to the chemical composition of the quantity of contraband seized from Todd, electing instead to focus on impeaching Todd's more damaging and wide ranging testimony about the major quantity of drugs allegedly transacted, which defense counsel vigorously attacked by highlighting numerous inconsistencies and contradictions in the witness's narrative. The decision to hew to that path throughout the trial was not professionally unreasonable in light of all the evidence arrayed against the petitioner, and the petitioner therefore has failed to sustain any

substantial claim that his trial counsel performed deficiently. Creech was not denied the effective assistance of counsel that the Sixth Amendment guarantees.

### III.

The petitioner's claims of ineffective assistance of counsel are without merit, and no hearing is required for that determination.

Accordingly, it is **ORDERED** that the petitioner's motion to vacate his sentence (ECF No. 124) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: May 14, 2025